# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on November 1, 2013

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>FLORENCE BIKUNDI, also )<br>known as "FLORENCE NGWE," )<br>and "FLORENCE IGWACHO," )<br><br>MICHAEL D. BIKUNDI, SR., )<br><br>CHRISTIAN S. ASONGCHA, )<br>also known as "CHRIS ASONG," )<br><br>MELISSA A. WILLIAMS, )<br><br>ELVIS N. ATABE, )<br><br>CARLSON M. IGWACHO, )<br><br>IRENE M. IGWACHO, )<br><br>BERENICE W. IGWACHO, and )<br><br>ATAWAN MUNDU JOHN, )<br><br>    Defendants. )<br>    ——————————————— ) | Case No. 14-CR-00030 (BAH)<br><br><br>Violations:<br>18 U.S.C. § 1349 (Conspiracy to Commit<br>Health Care Fraud)<br>18 U.S.C. § 1347 (Health Care Fraud)<br>18 U.S.C. § 1035 (False Statements in<br>Health Care Matters)<br>42 U.S.C. § 1320a-7b (Medicaid Fraud -<br>Failing to Disclose)<br>18 U.S.C. § 1956(h) (Money Laundering<br>Conspiracy)<br>18 U.S.C. § 1956(a)(1)(B)(i) (Laundering of<br>Monetary Instruments)<br>18 U.S.C. § 1957 (Engaging in Monetary<br>Transactions in Property Derived From<br>Specified Unlawful Activity)<br>18 U.S.C. § 1512(b)(3) (Attempted<br>Tampering with a Witness)<br>18 U.S.C. § 2 (Aiding and Abetting; Causing<br>an Act to be Done)<br><br>Forfeiture:<br>18 U.S.C. §§ 982(a)(1) & (7); and<br>21 U.S.C. § 853(p) |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At all relevant times, unless otherwise indicated:

1.     Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965.  Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health and Human Services ("HHS").  In the District of Columbia, Medicaid ("D.C. Medicaid") was jointly funded by the federal and District of Columbia governments.  Until September 30, 2008, D.C. Medicaid was administered by the Department of Health's Medical Assistance Administration; since October 1, 2008, D.C. Medicaid has been administered by the District's Department of Health Care Finance ("DHCF").  D.C. Medicaid provided health insurance coverage to residents of the District of Columbia whose incomes were below a certain financial threshold as measured against the poverty line.  Recipients of medical services covered by D.C. Medicaid were referred to as Medicaid "beneficiaries."  D.C. Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

2.     In the District of Columbia, home care agencies ("HCAs") were authorized to provide home care services, including personal care services, to D.C. Medicaid beneficiaries. Such services were provided by personal care aides ("PCAs") and were intended to assist D.C. Medicaid beneficiaries in performing the activities of daily living, known as "ADLs."  ADLs were defined to include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

3.     To receive personal care services covered by D.C. Medicaid, a beneficiary first had to obtain a prescription from a licensed physician or an advanced practice registered nurse. This prescription was informally known as an "intake."  D.C. Medicaid only reimbursed for personal care services if a physician or advanced practice registered nurse determined after a

physical examination that the beneficiary had functional limitations in one or more ADLs, and that the medical, nursing, and social needs of the beneficiary could be adequately and safely met in the beneficiary's home. Such a determination typically required a medical exam focused on the beneficiary's ability to perform ADLs, and required that the physician learn about the beneficiary's living environment and arrangements.

4. Intakes proposed the frequency and duration of PCA visits. A typical intake could prescribe eight hours of personal care services per day for a five-day week, or eight hours per day for a seven-day week. In the District of Columbia, during the six-month time-span authorized by a single intake or plan of care, D.C. Medicaid authorized payments to HCAs of approximately $16,952 (eight hours per day for five days per week) or approximately $23,732.80 (eight hours per day for seven days per week) for personal care services provided to one beneficiary.

5. The intake prescribed by the physician or advanced practice registered nurse would then be taken by the D.C. Medicaid beneficiary to an HCA. The HCA then would assign a PCA to the beneficiary and would arrange for a registered nurse to draft a plan of care after performing an initial assessment of the beneficiary's functional status and needs. The plan of care was required to specify the frequency, duration, and expected outcome of the personal care services, and was supposed to be tailored to address the individual needs of the beneficiary. The plan of care had to be approved by a physician or advanced practice registered nurse within 30 days of the start of personal care services actually being provided, and had to be re-certified by the prescribing physician or advanced practice registered nurse at least once every six months thereafter. The plan of care also had to be reviewed by a registered nurse at least once every 62 days, and updated or modified as needed to address the beneficiary's actual medical needs. D.C.

Medicaid regulations required that intakes and plans of care used to support HCA billings to D.C. Medicaid had to be signed by a licensed physician or advanced practice registered nurse.

6.      Once the plan of care was written, the HCA assigned a PCA to provide the personal care services to the D.C. Medicaid beneficiary.  Typically, the personal care services were performed in the beneficiary's home.  PCAs were required to document the personal care services provided to the beneficiary; this was usually done by completing and submitting a timesheet to the HCA or Nurse Staffing Agency ("NSA").  The timesheet reflected the amount of time each day that the PCA provided personal care services to the D.C. Medicaid beneficiary and the types of personal care services provided.  The timesheet was signed by both the PCA and the beneficiary to certify that personal care services were provided as reflected on the timesheet, and was submitted to the employing HCA or a NSA.  If the PCA was employed by an NSA, the NSA forwarded the PCA's timesheet to the HCA.  The timesheet was used by the HCA to submit claims to D.C. Medicaid for payment.

7.      D.C. Medicaid authorized payment per beneficiary for up to eight (8) hours of personal care services per day, and up to 1,040 hours of personal care services per calendar year. All personal care services beyond 1,040 hours per calendar year ("extended Personal care services") required prior authorization from DHCF.  If a D.C. Medicaid beneficiary received personal care services under the Elderly and Individuals with Physical Disabilities ("EPD") waiver, all personal care services required prior authorization before services were rendered and were limited to a maximum of sixteen (16) hours per beneficiary per day.

8.      Personal care services were billed in 15 minute increments, with each increment representing one (1) unit of service.  D.C. Medicaid authorized a maximum of 32 units of

4

personal care services per beneficiary per day. A maximum of 64 units of personal care services could be billed per beneficiary per day under the EPD waiver.

9.      In order to receive payments from D.C. Medicaid for providing covered personal care services, HCAs had to apply for and receive a unique D.C. Medicaid provider number, which was a necessary identifier for billing purposes. To obtain a provider number, HCAs submitted a provider enrollment application and executed a written provider agreement. In the provider application, HCAs agreed to know, understand, follow, and abide by all federal and local laws and D.C. Medicaid rules and regulations applicable to HCAs. With a D.C. Medicaid provider number, a HCA could submit or cause the submission of claims to D.C. Medicaid for payment for personal care services provided to D.C. Medicaid beneficiaries.

10.     The D.C. Medicaid provider agreement required, among other things, that the provider include: "A description of ownership and a list of major owners (stockholders owning or controlling five percent or more outstanding shares)." The provider agreement further specified that D.C. Medicaid could reject or terminate the agreement if the "owners, officers, managers or other persons with substantial contractual relationships have been convicted of certain crimes or received certain sanctions as specified in Section 1128 of the Social Security Act." By signing the provider agreement, the HCA and its authorized representative certified that they understood that payment of a claim by D.C. Medicaid was conditioned upon certification that the claims and the underlying transactions complied with all applicable laws, regulations, and program instructions, and with all applicable conditions of participation in D.C. Medicaid.

### D.C. Medicaid Record Keeping Requirements

11.     D.C. Medicaid providers, such as HCAs, were required to maintain the medical, financial, and administrative records concerning services provided to beneficiaries. The records were required to be maintained for the period of time required by all applicable laws and regulations, but in no event less than six (6) years from the date the service was rendered or the provider agreement was terminated.

12.     Among other things, HCAs were required to maintain written medical records of the medical assessment, the certified plan of treatment, and the personal care services provided to beneficiaries for whom claims for reimbursement were submitted by the HCA. D.C. Medicaid regulations required that medical records be sufficiently complete to permit a review of the appropriateness of reimbursement made by D.C. Medicaid to a HCA for services provided to a D.C. Medicaid beneficiary.

13.     D.C. Medicaid required that the written records maintained for each beneficiary to document the appropriateness of claims for payment include a Home Health Certification and Plan of Treatment form (HCFA Form 485). The HCFA Form 485 had to be signed by an attending physician, who certified that the patient was confined to his/her home and was in need of the planned personal care services. Any substantial changes to the plan of treatment or any personal care services required beyond a two month (62 days) period from the date of the original certification were required to be documented by a re-certification, by the attending physician, of the need for these changed or additional personal care services. This re-certification was also documented on a HCFA Form 485.

14.     HCAs were required to maintain written medical records of each visit with a beneficiary by a nurse or PCA, and a record of any skilled nurse visit documenting, among other

things, any observed significant signs or symptoms, any treatment and drugs administered, any reactions by the patient, and any changes in the patient's physical or emotional condition.

### The D.C. Medicaid Billing Process

15.     The American Medical Association assigns and publishes numeric codes, known as Current Procedural Terminology ("CPT"). The codes were a systematic listing of procedures and services performed by health care providers. Health care providers and health care benefit programs used the CPT codes to describe and evaluate the services for which they claimed, and to decide whether to issue or deny payment. Each health care benefit program established a fee reimbursement for each procedure described by a CPT code. The procedures and services represented by the codes were health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b). Under D.C. Medicaid, the first 1,040 hours of personal care services were billed using CPT code T1019. Any PCA service hours above 1,040 hours of personal care services were billed using CPT code T1019-U6. Under the EPD waiver program, all personal care services were billed using CPT code T1019-U3.

16.     To receive payments from D.C. Medicaid, HCAs operating in the District of Columbia were required to submit a claim, either electronically or in paper form, to DHCF through its fiscal agent, Xerox (formerly known as Affiliated Computer Services), which then processed the claims.

17.     Once Xerox processed a claim, it sent the approved claim amount back to DHCF; DHCF then forwarded the information to the D.C. Treasury, which paid the approved claim either by check sent through the U.S. mail or by an electronic fund transfer, whichever method the provider had requested.

18.     On each claim form that a HCA submitted or caused to be submitted to D.C. Medicaid, the HCA was required to identify certain information, such as the name of the beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was purportedly provided, and the amount of money being claimed by the HCA as payment from D.C. Medicaid.  D.C. Medicaid would only pay for services that were medically reasonable and necessary, and that were actually provided as claimed.

19.     The HHS Office of Inspector General ("HHS-OIG") was authorized by federal law to exclude health care providers from participation in the Medicaid program.

## INDIVIDUALS AND ENTITIES

20.     Defendant **FLORENCE BIKUNDI** ("**FLORENCE BIKUNDI**"), also known as "Florence Ngwe" and "Florence Igwacho," was a resident of the Commonwealth of Virginia and a resident of the state of Maryland.   Defendant **FLORENCE BIKUNDI** was a director, administrator, officer, and primary owner/stockholder of three HCAs operating in the District of Columbia and Maryland:  two entities named Global Healthcare, Inc., and one named Flo-Diamond, Inc.  Between July 2007 and the present, these entities received more than $78 million from Medicaid.

21.     Defendant **MICHAEL D. BIKUNDI, SR.** was a resident of Bowie, Maryland, and was married to defendant **FLORENCE BIKUNDI** in or about September 2009.  Defendant **MICHAEL D. BIKUNDI, SR.** was an executive officer and part owner of Global Healthcare, Inc., which was incorporated in Virginia on or about May 2, 2007 ("GLOBAL").

22.     Defendant **CHRISTIAN S. ASONGCHA**, also known as "Chris Asong," was a resident of Lanham, Maryland, was employed as the Office Manager at GLOBAL, and was responsible for overseeing the day-to-day operations of GLOBAL's D.C. office.    While

8

employed at GLOBAL, defendant **CHRISTIAN S. ASONGCHA** was also employed as a PCA for another HCA called I.H.C.S.I.

23.　Defendant **MELISSA A. WILLIAMS,** was a resident of Bowie, Maryland, and was employed as GLOBAL's Human Resources Officer and was in charge of screening new hires and maintaining employee files. During the same time period, and while employed by GLOBAL, defendant **MELISSA A. WILLIAMS** was also employed as a PCA for a HCA known as V.O.

24.　Defendant **ELVIS N. ATABE** was a resident of Adelphi, Maryland, and was employed by GLOBAL as the Quality Assurance Specialist.

25.　Defendant **CARLSON M. IGWACHO** was a resident of Bowie, Maryland, and was defendant **FLORENCE BIKUNDI**'s son. Defendant **CARLSON M. IGWACHO** was employed by GLOBAL as a PCA.

26.　Defendant **IRENE M. IGWACHO** was a resident of Bowie, Maryland, and was defendant **FLORENCE BIKUNDI**'s sister. Defendant **IRENE M. IGWACHO** was a registered nurse and was employed by GLOBAL as a PCA, and also worked in GLOBAL's D.C. office and assisted with patient charts and nurse certifications.

27.　Defendant **BERENICE W. IGWACHO** was a resident of Greenbelt, Maryland, and was defendant **FLORENCE BIKUNDI**'s sister. Defendant **BERENICE W. IGWACHO** was employed by GLOBAL as a PCA.

28.　Defendant **ATAWAN MUNDU JOHN** was a resident of Laurel, Maryland, and was employed by GLOBAL as a PCA.

29.　Incorporating documents identified defendant **FLORENCE BIKUNDI** as the sole director of GLOBAL. GLOBAL's status as an active and lawful Virginia corporation was

terminated on or about September 30, 2008, for failure to pay required annual registration fees, and was re-instated on or about October 25, 2012. GLOBAL's status was again terminated for the same reason effective September 30, 2013.

a.    On January 24, 2008, GLOBAL registered to do business in the District of Columbia as a foreign (Virginia) corporation and identified its principal place of business as 14531 Oak Cluster Drive, Centreville, Virginia 20120 – the address listed on its Virginia incorporation documents. In its two-year report filed with the District of Columbia on or about July 23, 2012, GLOBAL listed its address as 1818 New York Ave., N.E., Washington, D.C. 20002. GLOBAL was licensed in the District of Columbia as a home care agency and was enrolled as a provider in D.C. Medicaid. GLOBAL purported to provide personal care services to D.C. Medicaid beneficiaries.

b.    On or about October 9, 2008, GLOBAL registered to do business in Maryland as a foreign (Virginia) corporation, listing its principal place of business as the same Centreville, Virginia, address. GLOBAL's foreign corporation registration in Maryland identified defendant **FLORENCE BIKUNDI** as the resident agent.

c.    On or about April 28, 2009, defendant **FLORENCE BIKUNDI** filed a request with Maryland to terminate GLOBAL's foreign corporation registration, and on the same day defendant **FLORENCE BIKUNDI** incorporated in Maryland another company called Global Healthcare, Inc. ("GLOBAL-MD"). The incorporation filings identified "Florence Bikundi" as the sole incorporator, sole director, and resident agent. According to its public filings, GLOBAL-MD's original principal place of business was 15XXX Appleton Court, Bowie, Maryland 20716, which was also the residential listing for defendant **FLORENCE BIKUNDI**. On or about February 23, 2011, defendant **FLORENCE BIKUNDI**, as the

10

secretary and resident agent of GLOBAL-MD, filed with the state of Maryland a resolution changing GLOBAL-MD's principal place of business to a residential property that was purchased by defendant **FLORENCE BIKUNDI** in or around August 2009 and was her principal residence.

30.     Flo-Diamond, Inc. ("FLO-DIAMOND") was incorporated in Maryland on or about April 13, 2005, by defendant **FLORENCE BIKUNDI** (using the name "Florence Ngwe"). The articles of incorporation named defendant **FLORENCE BIKUNDI** as FLO-DIAMOND's sole director and resident agent.    On or about March 18, 2011, defendant **FLORENCE BIKUNDI**, using the name "Florence Bikundi," signed and filed with state of Maryland a resolution changing both FLO-DIAMOND's principal place of business and resident agent address to 600 Reisterstown Road, Pikesville, Maryland 21208.    On or about September 19, 2012, defendant **FLORENCE BIKUNDI**, using the name "Florence Igwacho," filed another resolution changing FLO-DIAMOND's principal place of business to 3042 Mitchellville Road, Bowie, Maryland 20716.

31.     GLOBAL-MD and FLO-DIAMOND were licensed in Maryland as resident service agencies and were enrolled as providers in Maryland Medicaid.  Both entities purported to provide personal care services to Maryland Medicaid beneficiaries.

32.     CFC Home Trade & Investments, LLC, was incorporated in October 2012 in Maryland and, according to its Articles of Organization, was engaged in the business of real estate development.  Defendant **CARLSON M. IGWACHO** was listed as the resident agent.

33.     Tri-Continental Trade and Development, Inc., was incorporated on May 1, 2008 in Maryland, and purportedly was engaged in the import/export business.    Defendants

**FLORENCE BIKUNDI** and **MICHAEL D. BIKUNDI, SR.** were listed as the company's directors. Defendant **FLORENCE BIKUNDI** was listed as the resident agent.

34.     V.O., I.H.C.S.I., and K.B.C. were licensed in the District of Columbia as HCAs and were enrolled as providers in D.C. Medicaid.   These companies purported to provide personal care services to D.C. Medicaid beneficiaries, and through their officers and agents submitted claims to D.C. Medicaid for reimbursement for those services.

35.     INDIVIDUAL A, whose identity is known to the Grand Jury, was employed by GLOBAL as a PCA.

## DEFENDANT FLORENCE BIKUNDI's DISCIPLINARY HISTORY

### *Virginia Nursing License and Revocation*

36.     On or about October 17, 1995, defendant **FLORENCE BIKUNDI** obtained a licensed practical nurse ("LPN") license from the Commonwealth of Virginia, under the name "Florence Ngwe Igwacho."  Following an investigation and hearing conducted by the Virginia Board of Nursing, effective on or about August 4, 1999, the Virginia Board of Nursing revoked defendant **FLORENCE BIKUNDI**'s LPN license.

37.     On or about April 13, 2004, defendant **FLORENCE BIKUNDI** executed a Virginia Application for Reinstatement of License as an LPN.  Following further review by the Virginia Board of Nursing, on or about December 29, 2004, the Board issued an Order denying defendant **FLORENCE BIKUNDI**'s request for reinstatement of her LPN license.

### *District of Columbia Nursing Licenses and Revocations*

38.     On or about March 28, 1996, defendant **FLORENCE BIKUNDI** obtained an LPN license in the District of Columbia under the name "Florence N. Igwacho."  This LPN license expired on June 30, 1999.

12

39.     On or about October 21, 2002, defendant **FLORENCE BIKUNDI** submitted an application to the District of Columbia Board of Nursing for an LPN license under the name of "Florence Igwacho." Effective November 15, 2002, the District of Columbia Department of Health issued an LPN license to defendant **FLORENCE BIKUNDI** under the name "Florence Igwacho."

40.     On or about June 20, 2003, defendant **FLORENCE BIKUNDI** submitted an application to the District of Columbia Department of Health for a registered nurse ("RN") license, under the name "Florence I. Ngwe." Effective September 4, 2003, the District of Columbia issued a RN license to defendant **FLORENCE BIKUNDI** under the name "Florence Ngwe."

41.     On or about May 18, 2005, the District of Columbia's Board of Nursing revoked defendant **FLORENCE BIKUNDI**'s LPN and RN licenses.

*South Carolina Nursing Licenses and Revocation:*

42.     Defendant **FLORENCE BIKUNDI** obtained a RN license in South Carolina under the name "Florence Igwacho Ngwe." The RN license expired on January 31, 2004.

43.     On or about March 20, 2004, defendant **FLORENCE BIKUNDI** submitted an application to the South Carolina Board of Nursing, seeking reinstatement of her expired RN license.

44.     On or about November 21, 2007, the South Carolina Board of Nursing permanently revoked defendant **FLORENCE BIKUNDI**'s RN license.

## DEFENDANT FLORENCE BIKUNDI's EXCLUSION FROM FEDERAL HEALTH CARE PROGRAMS

45.     On or about April 20, 2000, HHS-OIG notified defendant **FLORENCE BIKUNDI** in writing that she was excluded from participation in Medicare, Medicaid, and all

Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f). HHS-OIG based defendant **FLORENCE BIKUNDI**'s exclusion on the revocation of defendant **FLORENCE BIKUNDI**'s LPN license in Virginia. The exclusion prohibited defendant **FLORENCE BIKUNDI** from submitting or causing the submission of claims to, and receiving funds from, Federal health care programs such as Medicaid, and further prohibited defendant **FLORENCE BIKUNDI** from furnishing, ordering, or prescribing any item or service including administrative and managerial services that would be paid for, in whole or in part, by Medicaid.

46. The written exclusion notice informed defendant **FLORENCE BIKUNDI** that if and when her license was reinstated in Virginia, she could re-apply for participation in Federal health care programs, but that re-instatement was not automatic. The written exclusion letter and attachments sent to defendant **FLORENCE BIKUNDI** further contained the following information: "If you are an individual, program payment will not be made to any entity in which you are serving as an employee, administrator, operator, or in any other capacity, for any services including administrative and management services that you furnish, order, or prescribe on or after the effective date of this exclusion." In bold and underlined letters, the exclusion notice stated: "**obtaining a provider number from a Medicare contractor, a State agency, or a Federal health care program does not reinstate your eligibility to participate in those programs**."

47. The exclusion notice further warned: "you cannot submit claims or cause claims to be submitted for payment under any Federal health care program. Violations of the conditions of your exclusion may subject you to criminal prosecution . . . (42 U.S.C. 1320a-7b)." Defendant **FLORENCE BIKUNDI** was excluded from participation in all Federal health care programs under the name "Florence N. Igwacho," and her exclusion was publicly recorded under

14

that name. Although defendant **FLORENCE BIKUNDI** submitted applications for and obtained Medicaid provider numbers for HCAs that she owned and controlled, she never applied to HHS-OIG for re-instatement to participate in Federal health care programs.

### GLOBAL's MEDICAL PROVIDER APPLICATIONS AND AGREEMENTS

#### *D.C. Department on Disability Services Waiver Provider Enrollment Application*

48. On or about January 30, 2008, defendant **FLORENCE BIKUNDI**, on behalf of GLOBAL, submitted a Department on Disability Services Waiver Provider Enrollment Application ("DDS Waiver Application") to the District of Columbia Department of Health ("Department of Health"). Defendant **FLORENCE BIKUNDI**, on behalf of GLOBAL, applied for a D.C. Medicaid provider number so as to be paid for providing services to mentally challenged adults in the District of Columbia. GLOBAL's application identified its name as Global Healthcare, Inc., doing business as "GHCS." The application identified defendant **FLORENCE BIKUNDI** as the sole owner, and supporting documentation submitted with the application variously identified defendant **FLORENCE BIKUNDI** as a 60% and 70% shareholder. The application identified defendant **FLORENCE BIKUNDI** as a person "having direct or indirect ownership or a controlling interest of 5 percent or more." Defendant **FLORENCE BIKUNDI** signed the DDS Waiver Application using the name "Florence Bikundi."

49. On or about March 17, 2008, defendant **FLORENCE BIKUNDI** signed the ownership and disclosure statement using the title of "CEO" and the name "Florence Bikundi." In the provider agreement, submitted with the DDS Waiver Application, defendant **FLORENCE BIKUNDI**, on behalf of GLOBAL, agreed to comply with all requirements imposed on D.C. Medicaid providers, including all the provisions of the Social Security Act and all applicable

federal and local laws and regulations, including all D.C. Medicaid rules and regulations. Directly above the signature line in the provider agreement, the provider agreement included the following certification: "I/we agree that receipt by the D.C. Medicaid program of the first and each succeeding claim for payment from me/us will be the Medicaid program's understanding of my/our declaration that the provisions of this Agreement and supplemental providers manuals and instructions have been understood and complied with." Defendant **FLORENCE BIKUNDI**'s signature appears as the provider and as the primary administrator "responsible to enforce compliance with" the provisions of the agreement.

50. The DDS Waiver Application included a consent form authorizing the District of Columbia Medical Assistance Administration to obtain all information relevant to the evaluation of the application. Defendant **FLORENCE BIKUNDI** signed the consent form as "Authorized Applicant/Provider." As part of the consent form, defendant **FLORENCE BIKUNDI** "warrant[ed]" that all of her responses and information were "correct and complete to the best of [her] knowledge and belief."

51. The DDS Waiver Application ownership and disclosure section contained the following warning, in all capital letters, directly above the signature line: "WHOEVER KNOWINGLY AND WILLFULLY MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR REPRESENTATION OF THIS STATEMENT, MAY BE PROSECUTED UNDER APPLICABLE FEDERAL OR STATE LAWS." The application contained a further warning that failure to "fully and accurately" disclose the information requested in the application could result in a denial of the application or termination of the provider agreement.

52. In the DDS Waiver Application, defendant **FLORENCE BIKUNDI** failed to disclose her nursing license revocations and her exclusion from participation in all Federal health

care programs. In response to the following question on the application: "Has the applicant/provider ever been rejected or suspended from the Medicare or Medicaid program, or has your participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled or sanctioned)," the "No" box was checked. In response to the following question on the application: "Within the last five (5) years, has the applicant/provider ever been sanctioned, reprimanded or otherwise disciplined in any manner by any state licensing authority or other professional board or peer committee," the "No" box was checked.

53. None of the information provided by defendant **FLORENCE BIKUNDI** in the DDS Waiver Application and accompanying provider agreement contained any references to, or use of, the names Igwacho or Ngwe.

54. The D.C. Department of Health approved GLOBAL's DDS Waiver Application effective April 21, 2008, and GLOBAL was assigned D.C. Medicaid DDS waiver provider number xxxxx6900.

*D.C. Medicaid Provider Application*

55. On or about June 2, 2009, GLOBAL submitted another D.C. Medicaid provider application to DHCF. The names "J.M." and "Florence Igwacho Bikundi" appeared as the contact names on the application. The application contained the same certification language as that contained in the 2008 DDS Waiver Application. GLOBAL also submitted a D.C. Medicaid provider agreement with the application.

56. The application and accompanying provider agreement were purportedly signed by "J.M." as GLOBAL's authorized representative and director of nursing. Directly below the space marked "signature of individuals responsible to enforce compliance with these conditions"

were listed several names with signatures, including defendant **FLORENCE BIKUNDI** using the name "Florence Bikundi" as "Chief Executive Officer."

57.     As part of the application, GLOBAL was required to identify all individuals "having direct or indirect ownership or controlling interest" in the company.  However, GLOBAL did not list any individuals.

58.     GLOBAL's 2009 D.C. Medicaid provider application failed to fully disclose defendant **FLORENCE BIKUNDI**'s ownership and control of GLOBAL, and failed to disclose defendant **FLORENCE BIKUNDI**'s prior nursing license revocations and her exclusion from all Federal health care programs.

59.     DHCF granted GLOBAL's 2009 D.C. Medicaid provider application effective August 13, 2009, and GLOBAL was assigned D.C. Medicaid provider number xxxxx2200.

60.     Unbeknownst to DHCF, none of the signatures on GLOBAL's June 2, 2009, D.C. Medicaid provider application, except for defendant **FLORENCE BIKUNDI**'s signature, had been signed by the purported signatories.

### *GLOBAL-MD's Maryland Medicaid Provider Applications and Agreements*

61.     On or about April 5, 2010, GLOBAL-MD submitted a Maryland Medicaid provider application to the Maryland Department of Health and Mental Hygiene for the "Living at Home Waiver Program." This application was signed by defendant **FLORENCE BIKUNDI** in the space for the provider signature. The Provider Ownership and Control Form identified defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** as the only officers or directors of GLOBAL-MD. Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** were listed as having a combination of direct or indirect ownership interest equal to 5% or more. Defendant **FLORENCE BIKUNDI** signed the

ownership form as "Director of Human Resources." Defendant **FLORENCE BIKUNDI** signed the accompanying Medicaid provider agreement between GLOBAL-MD and the Maryland Department of Health as "Provider." The agreement required GLOBAL-MD to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Maryland Medicaid recipients without "prior written approval." The Maryland Department of Health approved the application effective May 13, 2010, and issued GLOBAL-MD, in the name of "Global Healthcare Services," Maryland Medicaid Living at Home waiver provider number xxxxx2500.

62.     On or about April 27, 2011, GLOBAL-MD submitted another Maryland Medicaid provider application to the Maryland Department of Health. The application listed the only owners of GLOBAL-MD as defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** The Provider Ownership and Control Disclosure Form included with the application named defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** as the only officers or directors with each of them having a direct or indirect ownership interest of 5% or more. Defendant **MICHAEL D. BIKUNDI, SR.** signed the ownership form as "C.E.O."

63.     The Maryland Medicaid provider agreement accompanying the 2011 application required GLOBAL-MD to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Maryland Medicaid recipients without "prior written approval."

64.     The Maryland Department of Health approved the application effective February 16, 2012, and issued GLOBAL-MD Medicaid provider number xxxxx7800. Both Maryland

Medicaid provider applications and agreements failed to disclose that defendant **FLORENCE BIKUNDI** was excluded from participation in all Federal health care programs.

*Flo-Diamond's Maryland Medicaid Provider Applications and Agreements*

65. On or about March 1, 2006, FLO-DIAMOND submitted a Maryland Medicaid provider application for Medicaid Waiver for Older Adults to the Maryland Department of Health. The application was signed by defendant **MICHAEL D. BIKUNDI, SR.**, and failed to disclose any ownership or control or interest of defendant **FLORENCE BIKUNDI**. In the provider agreement, FLO-DIAMOND agreed, among other things, not to employ or contract with any person who had been disqualified to provide services to Maryland Medicaid recipients.

66. The Maryland Department of Health approved the application effective March 28, 2006, and issued FLO-DIAMOND Maryland Medicaid waiver provider number xxxxx4500.

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud – Fraudulent Billings)

67. Paragraphs 1 through 35 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

68. From in or around August 2009 through in or around February 2014, the exact dates being unknown to the Grand Jury, in the District of Columbia and elsewhere, the defendants,

**FLORENCE BIKUNDI, a/k/a "Florence Ngwe" and "Florence Igwacho,"
MICHAEL D. BIKUNDI, SR.,
CHRISTIAN S. ASONGCHA, a/k/a "Chris Asong,"
MELISSA A. WILLIAMS,
ELVIS N. ATABE,
CARLSON M. IGWACHO,
IRENE M. IGWACHO, and
BERENICE W. IGWACHO,**

did knowingly and willfully, that is with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

       a.    To knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, D.C. Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347 (Health Care Fraud);

       b.    To knowingly and willfully falsify, conceal, and cover up by trick, scheme, or device a material fact, and make any materially false, fictitious, and fraudulent statements and representations, and make and use any materially false writing and document knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services, submitted and caused to be submitted, to D.C. Medicaid, in violation of Title 18, United States Code, Section 1035 (False Statements in Health Care matters); and

       c.    To make illegal payments in connection with a Federal health care program, accomplished by knowingly and willfully soliciting and receiving any remuneration, and offering and paying any remuneration, including kickbacks, bribes and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, and to

purchase, lease, order, and arrange for and recommend purchasing, leasing and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b) (Illegal Payments in Connection with Federal Health Care Programs).

**Goal of the Conspiracy**

69.     It was the goal of the conspiracy for the defendants, and their co-conspirators to unlawfully enrich themselves by submitting false and fraudulent claims to D.C. Medicaid.

**Manner and Means of the Conspiracy**

70.     The manner and means by which the defendants and their co-conspirators sought to accomplish the goal of the conspiracy included, among others, the following:

a.      Defendants and co-conspirators offered and caused to be offered cash payments to patient recruiters in return for referring D.C. Medicaid beneficiaries to serve as patients of GLOBAL.

b.      Defendants and co-conspirators recruited and caused to be recruited D.C. Medicaid beneficiaries who were willing to receive cash payments in exchange for certifying that the PCA had provided services as prescribed when, in fact, the services as claimed were not provided.

c.      Defendants and co-conspirators falsified and caused to be falsified GLOBAL patient files to make it appear that D.C. Medicaid beneficiaries were qualified for and received personal care services that were not provided.

d.      Defendants and co-conspirators falsified and caused to be falsified GLOBAL employee files to make it appear that GLOBAL employees were qualified to provide

personal care services to D.C. Medicaid beneficiaries, when in fact, they were not qualified to provide those services.

       e.     Defendants and co-conspirators created and caused to be created false and fraudulent PCA timesheets which falsely certified that personal care services were provided to D.C. Medicaid beneficiaries when the services were not provided.

       f.     Defendants and co-conspirators submitted and caused to be submitted false and fraudulent claims to D.C. Medicaid seeking payment for the costs of personal care services that were not provided.

**(Conspiracy to Commit Health Care Fraud – Fraudulent Billings, in violation of Title 18, United States Code, Section 1349.)**

<u>**COUNT TWO**</u>
**(Health Care Fraud – Fraudulent Billings)**

71.     Paragraphs 1 through 35 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

72.     From at least in or around August 2009, continuing until in or around February 2014, in the District of Columbia, and elsewhere, the defendants,

**FLORENCE BIKUNDI, a/k/a "Florence Ngwe" and "Florence Igwacho,"
MICHAEL D. BIKUNDI, SR.,
CHRISTIAN S. ASONGCHA, a/k/a "Chris Asong,"
MELISSA A. WILLIAMS,
ELVIS N. ATABE,
CARLSON M. IGWACHO,
IRENE M. IGWACHO, and
BERENICE W. IGWACHO,**

aiding and abetting each other, and others, known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of, the D.C. Medicaid program, a health

care benefit program, as defined in 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, namely personal care services.

### Purpose of the Scheme

73.     It was a purpose of the scheme for defendants **FLORENCE BIKUNDI, MICHAEL D. BIKUNDI, SR., CHRISTIAN S. ASONGCHA, MELISSA A. WILLIAMS, ELVIS N. ATABE, CARLSON M. IGWACHO, IRENE M. IGWACHO,** and **BERENICE W. IGWACHO,** and others to unlawfully enrich themselves by, among other things, submitting and causing to be submitted false and fraudulent claims for payment to D.C. Medicaid for personal care services that were not provided as claimed.

### Manner and Means of the Scheme

74.     The manner and means by which defendants sought to accomplish the purpose of the fraud scheme, included, among others the following:

        a.      Defendants and co-conspirators offered and caused to be offered cash payments to patient recruiters in return for referring D.C. Medicaid beneficiaries to serve as patients of GLOBAL.

        b.      Defendants and co-conspirators recruited and caused to be recruited D.C. Medicaid beneficiaries who were willing to receive cash payments in exchange for certifying that the PCA had provided services as prescribed when the services were not provided.

        c.      Defendants and co-conspirators falsified and caused to be falsified GLOBAL patient files to make it appear that D.C. Medicaid beneficiaries were qualified for and received personal care services that were not provided.

        d.      Defendants and co-conspirators falsified and caused to be falsified GLOBAL employee files to make it appear that GLOBAL employees were qualified to provide

24

personal care services to D.C. Medicaid beneficiaries, when they were not qualified to provide those services.

      e.      Defendants and co-conspirators created and caused to be created false and fraudulent PCA timesheets which falsely certified that personal care services were provided to D.C. Medicaid beneficiaries when the services were not provided.

      f.      Defendants and co-conspirators submitted and caused to be submitted false and fraudulent claims to D.C. Medicaid seeking payment for the costs of personal care services that were not provided.

<strong>Execution of the Scheme</strong>

75.      In execution of the scheme and artifice to defraud, defendants, aiding and abetting each other, caused the submission of false and fraudulent claims to D.C. Medicaid with knowledge that the claims were false and fraudulent. Claims for reimbursement submitted to D.C. Medicaid for personal care services purportedly provided to each of the following Medicaid beneficiaries were false and fraudulent because, among other reasons, the personal care services were not provided as claimed, and the services were tainted by illegal kickbacks:

| D.C. MEDICAID BENEFICIARY I.D. NUMBER | DATE RANGE | PCA(s) | HCA |
|---|---|---|---|
| 1- XXXX4279 | August 2008 – July 2013 | CARLSON M. IGWACHO and others known and unknown to the Grand Jury | GLOBAL |
| 2– XXXX0062 | January 2009 – May 2010 | Individuals known and unknown to the Grand Jury | GLOBAL |
| 3- XXXX2921 | October 2009 – February 2014 | Individuals known and unknown to the Grand Jury | GLOBAL |
| 4– XXXX3503 | November 2009 – June 2011 | Individuals known and unknown to the Grand Jury | GLOBAL |
| 5- XXXX2282 | November 2009 – January 2014 | CARLSON M. IGWACHO and others known and unknown to the Grand Jury | GLOBAL |
| 6– XXXX9479 | June 2010 – January 2014 | Individuals known and unknown to the Grand Jury | GLOBAL |

| D.C. MEDICAID BENEFICIARY I.D. NUMBER | DATE RANGE | PCA(s) | HCA |
|---|---|---|---|
| 7– XXXX2570 | August 2010 – July 2013 | Individuals known and unknown to the Grand Jury | GLOBAL |
| 8- XXXX0699 | October 2010 – February 2014 | BERENICE W. IGWACHO and others known and unknown to the Grand Jury | GLOBAL |
| 9- XXXX7041 | May 2011 – January 2014 | IRENE M. IGWACHO and others known and unknown to the Grand Jury | GLOBAL |
| 10- XXXX5715 | November 2011 – August 2013 | CARLSON M. IGWACHO, BERENICE W. IGWACHO, and others known and unknown to the Grand Jury | GLOBAL |
| 11– XXXX3081 | April 2012 – January 2014 | Individuals known and unknown to the Grand Jury | GLOBAL |
| 12- XXXX7450 | May 2012 – January 2014 | IRENE M. IGWACHO and others known and unknown to the Grand Jury | GLOBAL |
| 13– XXXX3390 | June 2013 – January 2014 | Individuals known and unknown to the grand jury | GLOBAL |
| 14- XXXX4210 | June 2013 – February 2014 | MELISSA A. WILLIAMS and others known and unknown to the Grand Jury | GLOBAL |
| 15 – XXXX1666 | September 2013 – February 2014 | Individuals known and unknown to the grand jury | GLOBAL |
| 16– XXXX3910 | September 2013 – February 2014 | Individuals known and unknown to the grand jury | GLOBAL |
| 17– XXXX0929 | September 2013 – February 2014 | Individuals known and unknown to the grand jury | GLOBAL |

**(Health Care Fraud – Fraudulent Billings, in violation of Title 18, United States Code, Section 1347, and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2.)**

## COUNTS THREE THROUGH TWELVE
### (False Statements in Health Care Matters)

76.     Paragraphs 1 through 35 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

77.     On or about the dates set forth below as to each count, in the District of Columbia and elsewhere, the defendants as specified below, in matters involving a health care benefit program, knowingly and willfully falsified, concealed, and covered up by trick, scheme, or device a material fact, and made materially false, fictitious, and fraudulent statements and

26

representations, and made and used materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and submitted and caused to be submitted fraudulent claims for payment to D.C. Medicaid for services purportedly provided to each of the D.C. Medicaid beneficiaries listed below (each claim constituting a separate count of this Indictment). For each count listed below, the claims for payment to D.C. Medicaid were false and fraudulent because, among other reasons, the services were not provided as claimed:

| COUNT | DEFENDANT | D.C. MEDICAID BENEFICIARY ID NUMBER | DATES/ HOURS/UNITS OF PURPORTED SERVICES |
|---|---|---|---|
| 3 | BERENICE W. IGWACHO | XXXX5715 | 12/21/2009 through 12/25/2009 (40 HOURS/ 160 UNITS) |
| 4 | CARLSON M. IGWACHO | XXXX2282 | 12-20-2010 through 12-26-2010 (56 HOURS/ 224 UNITS) |
| 5 | MELISSA A. WILLIAMS | XXXX2921 | 02/07/2011 through 02/13/2011 (56 HOURS) |
| 6 | MELISSA A. WILLIAMS | XXXX2921 | 03-14-2011 through 03-20-2011 (56 HOURS/ 224 UNITS) |
| 7 | BERENICE W. IGWACHO | XXXX0699 | 07/04/2011 through 07/08/2011 (40 HOURS/ 160 UNITS) |
| 8 | CARLSON M. IGWACHO | XXXX4279 | 03/12/2012 through 03/18/2012 (56 HOURS/224 UNITS) |
| 9 | IRENE M. IGWACHO | XXXX7041 | 09-12-2013 through 09-22-2013 (16 HOURS/64 UNITS) |
| 10 | IRENE M. IGWACHO | XXXX7450 | 10-07-2013 through 10-11-2013 (40 HOURS/160 UNITS)) |
| 11 | CHRISTIAN S. ASONGCHA | XXXX8843 | 12/23/2013 through 12/29/2013(56 HOURS/ 224 UNITS) |
| 12 | CHRISTIAN S. ASONGCHA | XXXX8843 | 01/20/2014 through 01/26/2014 (56 HOURS/ 224 UNITS) |

**(False Statements in Health Care Matters, in violation of Title 18, United States Code, Section 1035, and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2.)**

## COUNT THIRTEEN
### (Health Care Fraud – Exclusion From Program)

78.     Paragraphs 1 through 20 and 29 through 66 of this Indictment are re-alleged and

incorporated by reference as though fully set forth herein.

### Purpose of the Scheme and Artifice

79.     It was a purpose of the scheme to defraud for defendant **FLORENCE BIKUNDI**

to conceal her exclusion from participation in all Federal health care programs in order to make

money through payments from D.C. Medicaid.

### Manner and Means

80.     The manner and means by which defendant sought to accomplish the purpose of

the scheme to defraud included, among others, the following:

     a.     Defendant incorporated or caused the incorporation of GLOBAL for the

purpose of defrauding and obtaining money from D.C. Medicaid.

     b.     Defendant signed and submitted, and caused the submission of, the DDS

Waiver Application that failed to disclose her nursing license revocations and her exclusion from

participation in all Federal health care programs.  The DDS Waiver Application also contained

false statements that the applicant/provider had never been rejected or suspended from the

Medicare or Medicaid programs, and within the last five years had never been sanctioned,

reprimanded, or otherwise disciplined in any manner by any state licensing authority.

     c.     Defendant signed and submitted, and caused the submission of, D.C.

Medicaid provider applications and agreements for GLOBAL that concealed and failed to

disclose that defendant's nursing licenses had been revoked.

     d.     Defendant signed and submitted, and caused the submission of D.C.

Medicaid provider applications and agreements, among others, for GLOBAL that: (1) concealed

and failed to disclose that defendant was excluded from participation in all Federal health care programs; and (2) contained false and fraudulent representations and which contained forged signatures of individuals who were responsible for certifying that all claims for payment submitted to D.C. Medicaid by GLOBAL complied with D.C. Medicaid rules and regulations.

        e.    In violation of the terms of her exclusion, and based on false and fraudulent representations contained the provider agreement, defendant submitted and caused GLOBAL to submit claims to D.C. Medicaid.

        f.    In violation of the terms of her exclusion, and based on false and fraudulent representations in the provider agreement, from July 2008 through February 2014, defendant caused the payment of D.C. Medicaid funds to GLOBAL for items or services, including administrative and managerial services, that defendant furnished or ordered while she served as an owner, employee, administrator, and in other capacities at GLOBAL in excess of $75 million.

**(Health Care Fraud – Exclusion from Program, in violation of Title 18, United States Code, Section 1347, and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2)**

## COUNT FOURTEEN
**(Medicaid Fraud – Concealing and Failing to Disclose)**

    81.    Paragraphs 1 through 20 and 29 through 66 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

    82.    From in or around August 2009 through February 2014, in the District of Columbia and elsewhere, defendant **FLORENCE BIKUNDI**, having knowledge of the occurrence of any event affecting defendant **FLORENCE BIKUNDI**'s and GLOBAL's initial and continued right to any payment under a Federal health care program, concealed and failed to disclose such event with intent fraudulently to secure such payment either in a greater amount

and quantity than was due or when no such payment was authorized, namely: that defendant **FLORENCE BIKUNDI** was excluded from participation in all Federal health care programs including D.C. Medicaid, and that defendant **FLORENCE BIKUNDI** was an owner, officer, director, and employee of and actively participating in the management and administration of GLOBAL while she was excluded from participation in all Federal health care programs and had submitted D.C. Medicaid provider agreements that contained false and fraudulent representations and which contained forged signatures of individuals who were responsible for certifying that all claims for payment submitted to D.C. Medicaid by GLOBAL complied with D.C. Medicaid rules and regulations.

**(Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(a)(3), and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Section 2.)**

### COUNT FIFTEEN
**(Money Laundering Conspiracy)**

83.     Paragraphs 1 through 66 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

84.     Beginning as early as in or around August 2009 and continuing through in or around February 2014, the exact dates being unknown to the Grand Jury, within the District of Columbia and elsewhere, defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** did knowingly combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to:

a.     conduct and attempt to conduct financial transactions affecting interstate commerce involving the proceeds of specified unlawful activity, that is: Conspiracy to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349; Health Care

Fraud, in violation of Title 18, United States Code, Section 1347; False Statements in Health Care Matters, in violation of Title 18, United States Code, Section 1035; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(a)(3), knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

      b.  knowingly engage and attempt to engage in monetary transactions affecting interstate commerce, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, that is: Conspiracy to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349; Health Care Fraud, in violation of Title 18, United States Code, Section 1347; False Statements in Health Care Matters, in violation of Title 18, United States Code, Section 1035; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(a)(3), and in violation of Title 18, United States Code, Section 1957.

### Goal of the Conspiracy

85.    The goals of the conspiracy were for the defendants:

      a.     to unlawfully enrich themselves and their family members;

      b.     to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity; and

    c.     to engage in monetary transactions of a value greater than $10,000.

## Manner and Means of the Conspiracy

86.    The manner and means used to accomplish the goals of the conspiracy included, among others, the following:

    a.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** transferred the proceeds of specified unlawful activity to bank accounts in the names of two shell corporations, CFC Home Trade and Investment, LLC and Tri-Continental Trade and Development, Inc.;

    b.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** made numerous false statements on applications to banks, mortgage providers, insurance companies, and other financial institutions;

    c.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** purchased numerous cashier's checks and official checks with the proceeds of specified unlawful activity;

    d.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** wired the proceeds of specified unlawful activity to bank accounts located in Cameroon;

    e.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** used the proceeds of specified unlawful activity to purchase numerous luxury vehicles for themselves and family members;

    f.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** used the proceeds of specified unlawful activity to pay off their mortgage and renovate their home;

g.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** used the proceeds of specified unlawful activity to establish college savings plans for their children and grandchildren;

h.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** used the proceeds of specified unlawful activity to purchase numerous insurance policies for themselves; and

i.     Defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** used the proceeds of specified unlawful activity to fund IRA accounts.

### Overt Acts

87.     In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the conspirators committed and caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

a.     On or about August 11, 2009, defendant **FLORENCE BIKUNDI** submitted a loan application to Bank of America for a mortgage on the real property located at XXX Jennings Mill Drive, Mitchellville, Maryland.  On the application, defendant **FLORENCE BIKUNDI** made numerous false statements, including the following:

1.  that she had not declared bankruptcy within the past seven years;

2.  that she was a United States citizen;

3.  that she was not presently delinquent or in default of any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee; and

4.  that she had not had an ownership interest in a property in the last three years.

b.      On or about November 13, 2009, GLOBAL submitted a Medicaid Provider ACH/Direct Deposit Enrollment Form to the District of Columbia Department of Health designating PNC Bank account no. XXXXXX5874 as the account to receive D.C. Medicaid payments.   Defendant **FLORENCE BIKUNDI** signed the certification for the Enrollment Form as "CFO or Authorized Representative" for GLOBAL.

c.      On or about July 2, 2010, defendant **FLORENCE BIKUNDI** submitted a life insurance application to Life Insurance Company of the Southwest.  On the application, defendant **FLORENCE BIKUNDI** made the following false statements:

1.  that she had never been convicted of a felony or misdemeanor;

2.  that there had been no bankruptcy proceedings against her within the last seven years; and

3.  that she was a United States citizen.

d.      On or about December 27, 2010, GLOBAL submitted a Medicaid Provider ACH/Direct Deposit Enrollment Form to the District of Columbia Department of Health designating PNC Bank account no. XXXXXX5874 as the account to receive D.C. Medicaid payments.  Defendant **MICHEAL D. BIKUNDI, SR.** signed the certification for the Enrollment Form as "CFO or Authorized Representative" for GLOBAL.

e.      On or about February 24, 2011, defendant **FLORENCE BIKUNDI** completed an M&T Securities Data Profile form.   On the form, defendant **FLORENCE BIKUNDI** falsely stated that she was a United States citizen.

f.      On or about August 6, 2012, defendant **FLORENCE BIKUNDI** submitted an annuity application to New York Life.  On the application, defendant **FLORENCE BIKUNDI** falsely stated that she was a United States citizen.

34

g. On or about August 23, 2012, defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** opened Citibank account no. XXXXXX3303 held in the name of Tri-Continental Trade and Development. On a Business Signer Personal Information Form, defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** falsely stated that they were United States citizens.

h. On or about October 14, 2012, GLOBAL submitted an ACH Vendor Payment Enrollment Form to the District of Columbia Department of Health authorizing the District of Columbia to credit Medicaid payments to Bank of America account no. XXXXXXXX2241. Defendant **FLORENCE BIKUNDI** signed the Enrollment Form as the "Administrator" for GLOBAL.

i. On or about February 6, 2013, defendant **FLORENCE BIKUNDI** mailed check no. 329 payable to Mercedes-Benz Financial and drawn from Citibank account no. XXXXXX7466.

j. On or about April 18, 2013, defendant **FLORENCE BIKUNDI** submitted a life insurance application to Lincoln National Life Insurance Company. On the application, defendant **FLORENCE BIKUNDI** falsely stated that she was a United States citizen.

k. On or about May 20, 2013, defendant **FLORENCE BIKUNDI** submitted a life insurance application to Liberty Life Assurance Company. On the application, defendant **FLORENCE BIKUNDI** falsely stated that she was a United States citizen.

l. On or about June 5, 2013, defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.** withdrew and caused to be withdrawn $31,622.08 from Bank of America account no. XXXXXXXX2254 to purchase Cashier's Check no. 0582320.

m.     On or about November 14, 2013, defendant **FLORENCE BIKUNDI** submitted a life insurance application to Western Reserve Life Assurance Company.  On the application, defendant **FLORENCE BIKUNDI** falsely stated that she was a United States citizen and that she had not been convicted of a misdemeanor (other than a minor traffic violation) or felony, or been on probation or parole in the past 10 years.

**(Money Laundering Conspiracy, in violation of Title 18, United States Code, Section 1956(h))**

**COUNTS SIXTEEN THROUGH TWENTY-TWO**
**(Laundering of Monetary Instruments)**

88.     The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 66, as if fully set forth herein.

89.     On or about the dates and in the amounts set forth below, defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.**, having participated in the transfer of the proceeds of specified unlawful activity, that is: Conspiracy to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349; Health Care Fraud, in violation of Title 18, United States Code, Section 1347; False Statements in Health Care Matters, in violation of Title 18, United States Code, Section 1035; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(a)(3), from the District of Columbia to the District of Maryland, did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce and involving the proceeds of said specified unlawful activity, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while

36

conducting and attempting to conduct such financial transaction knew that the property involved

in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | On or about Date | Amount | Financial Transaction |
|---|---|---|---|
| 16 | November 7, 2012 | $400,000.00 | Check no. 4972 drawn from PNC Bank account no. XXXXXX6271 payable to TRICO T.D. INC and deposited into Citibank account no. XXXXX3303 |
| 17 | March 18, 2013 | $500,000.00 | Check no. 2007 drawn from Bank of America account no. XXXXXXXX8612 payable to TRI CONTINENTAL T&D INC and deposited into Citibank account no. XXXXXXX3559 |
| 18 | April 29, 2013 | $400,000.00 | Check no. 2016 drawn from Bank of America account no. XXXXXXXX8612 payable to TRI CONTINENTAL T&D INC and deposited into Citibank account no. XXXXXXX3303 |
| 19 | May 10, 2013 | $370,000.00 | Wire from Bank of America account no. XXXXXXXX8612 to Bank of America account no. XXXXXXXXX6749 |
| 20 | June 7, 2013 | $400,000.00 | Check no. 2024 drawn from Bank of America account no. XXXXXXXX8612 payable to CFC Hometrade & Investment LLC and deposited into Bank of America account no. XXXXXXXX6749 |
| 21 | June 21, 2013 | $240,000.00 | Check no. 2027 drawn from Bank of America account no. XXXXXXXX8612 payable to CFC Hometrade & Investment LLC and deposited into Bank of America account no. XXXXXXXX6749 |
| 22 | August 2, 2013 | $360,000.00 | Check no. 2054 drawn from Bank of America account no. XXXXXXXX8612 payable to CFC Hometrade & Investment LLC and deposited into Bank of America account no. XXXXXXXX6749 |

**(Laundering of Monetary Instruments, and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 2)**

## COUNTS TWENTY-THREE THROUGH TWENTY-FIVE
**(Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity)**

90.     The Grand Jury re-alleges and incorporates by reference the allegations of

paragraphs 1 through 66, as if fully set forth herein.

91. On or about the dates and in the amounts set forth below, defendant **FLORENCE BIKUNDI** and defendant **MICHAEL D. BIKUNDI, SR.**, having participated in the transfer of the proceeds of specified unlawful activity, that is: Conspiracy to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349; Health Care Fraud, in violation of Title 18, United States Code, Section 1347; False Statements in Health Care Matters, in violation of Title 18, United States Code, Section 1035; and Making or Causing to be Made False Statements or Representations Involving Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(a)(3), from the District of Columbia to the District of Maryland, did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, in criminally derived property of a value greater than $10,000 and that was derived from said specified unlawful activity:

| Count | On or About Date | Amount | Monetary Transaction |
|-------|-----------------|--------|----------------------|
| 23 | January 28, 2013 | $25,000.00 | Check no. 438 drawn from Citibank account no. XXXXXX7466 payable to Porsche Silver Spring |
| 24 | June 24, 2013 | $56,000.00 | Check no. 1021 from Bank of America account no. XXXXXXXX6749 payable to Florence Bikundi |
| 25 | July 2, 2013 | $30,000.00 | Check no. 548 drawn from Citibank account no. XXXXXX7466 payable to Annapolis Motor Cars |

**(Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity, and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1957, 2)**

**COUNT TWENTY-SIX**
**(Attempted Tampering with a Witness)**

92. Paragraphs 1 through 35 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

93. On or about July 12, 2014, defendant **MELISSA A. WILLIAMS** did knowingly attempt to corruptly persuade INDIVIDUAL A, with the intent to cause or induce INDIVIDUAL

A to withhold information or communicate false information to law enforcement relating to the commission of a Federal offense, namely Health Care Fraud.

**(Attempted Tampering with a Witness, in violation of Title 18, United States Code, Section 1512(b)(3).)**

## COUNT TWENTY-SEVEN
**(Attempted Tampering with a Witness)**

94.    Paragraphs 1 through 35 this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

95.    On or about June 12, 2014, defendant **ATAWAN MUNDU JOHN** did knowingly attempt to corruptly persuade a D.C. Medicaid beneficiary with Medicaid Identification Number XXXX0479, with the intent to cause or induce the D.C. Medicaid beneficiary to withhold information or communicate false information to law enforcement relating to the commission of a Federal offense, namely Health Care Fraud.

**(Attempted Tampering with a Witness, in violation of Title 18, United States Code, Section 1512(b)(3).)**

## FORFEITURE ALLEGATION

1.    Upon conviction of an offense alleged in Counts One, Two, Thirteen, or Fourteen, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.  The United States will seek a forfeiture money judgment against the defendant in the amount of at least $75,000,000 upon conviction of the offense.

a. The Grand Jury finds by probable cause that the following specific property is subject to forfeiture upon conviction of an offense alleged in Counts One, Two, Thirteen, or Fourteen:

(1)     One 10kt. white gold ruby and diamond bracelet alternatively set with twenty-one (21) round rubies and twenty-one (21) single cut meleé diamonds seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(2)     One 14kt. yellow gold and diamond line bracelet with interlocking, domed links each set with one round brilliant cut diamond for a total of forty-two (42) diamonds seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(3)     One 14kt. yellow gold and diamond band ring with ten (10) graduating, princess-cut diamonds in a channel setting seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(4)     One 14kt. two tone gold diamond engagement ring set with one .41ct princess cut diamond seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(5)     One pair of matching 18kt. yellow gold and diamond band rings with twenty (20) round brilliant meleé diamonds set on each band seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(6)     One 14kt. yellow gold and diamond band ring with nine (9) round brilliant cut diamonds in a channel setting seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(7)     $72,900.00 in U.S. currency seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(8)     $210,666.37 seized from T. Rowe Price account no. 50239644;

(9)     $152,839.93 seized from T. Rowe Price account no. 50239645;

(10)    $160,887.45 seized from T. Rowe Price account no. 50239646;

(11)    $203,167.63 seized from T. Rowe Price account no. 50239647;

(12)    $43,328.66 seized from T. Rowe Price account no. 50230912;

(13)    $23,009.20 seized from T. Rowe Price account no. 50230913;

(14)    $20,913.60 seized from T. Rowe Price account no. 50230914;

(15)    $1,046,014.59 seized from M&T Bank account no. 15004229522196;

(16)    $139.72 seized from M&T Bank account no. 9853015700;

(17)    $133.37 seized from M&T Bank account no. 15004224354908;

(18)   $359.46 seized from SECU account no. 8001989881;

(19)   $3,872.06 seized from SECU account no. 8001989899;

(20)   $20,712.69 seized from SECU account no. 8008357668;

(21)   $3,354.70 seized from SECU account no. 8008357684;

(22)   $10,308.13 seized from SECU account no. 8008357676;

(23)   $1,000.34 seized from Capital One Bank account no. 1372786821;

(24)   $1,000.34 seized from Capital One Bank account no. 1372786813;

(25)   $142,995.42 seized from Capital One Bank account no. 1360715015;

(26)   $49,080.58 seized from Capital One Bank account no. 1360715031;

(27)   $6,001.75 seized from Merrill Lynch account no. 26X41N62;

(28)   $6,001.75 seized from Merrill Lynch account no. 53Z41N60;

(29)   $55,153.53 seized from Merrill Lynch account no. 7Y125B15;

(30)   $55,153.53 seized from Merrill Lynch account no. 7Y125B16;

(31)   $302,913.68 seized from Pruco Life Insurance Company annuity contract no. E1663331;

(32)   $308,752.81 seized from Pruco Life Insurance Company annuity contract no. E1649676;

(33)   $484,894.30 seized from New York Life Insurance and Annuity Corporation contract no. 53133740;

(34)   $5,000.96 seized from New York Life Roth IRA account no. N24-943983;

(35)   $5,000.96 seized from New York Life Roth IRA account no. N24-944009;

(36)   $235,278.85 seized from Transamerica Life Insurance Company account no. 125117LK8;

(37)   $100,000.00 seized from Liberty Life Assurance Company policy no. 78859466NU3;

(38)    $312,404.95 seized from MetLife account no. 9201219305;

(39)    $508,239.83 seized from American General Life Insurance Company/Western National contract no. 5AO00976;

(40)    $279,809.16 seized from American General Life Insurance Company/Western National contract no. XV216852;

(41)    $7,081.76 seized from Western Reserve Life Assurance policy no. 50W0042744;

(42)    $3,520.05 seized from Western Reserve Life Assurance policy no. 014454381;

(43)    $25,092.70 seized from Ameriprise Financial account no. 0000-3398-0023-7-133;

(44)    $83,275.65 seized from Life Insurance Company of the Southwest policy no. LS0228105;

(45)    $20,089.19 seized from Life Insurance Company of the Southwest policy no. LS0277352;

(46)    $25,877.13 seized from Life Insurance Company of the Southwest policy no. LS0277358;

(47)    $8,645.77 seized from Life Insurance Company of the Southwest policy no. LS0331874;

(48)    $1,141.25 seized from Life Insurance Company of the Southwest policy no. LS0331892;

(49)    $955.07 seized from Life Insurance Company of the Southwest policy no. LS0331897;

(50)    $100,000.00 seized from Lincoln National Life Insurance Company policy no. 0000P52794;

(51)    $100,000.00 seized from Lincoln National Life Insurance Company policy no. 0000P47173;

(52)    $225,675.94 seized from Citibank Wealth account no. C14-067463;

(53)    $121,641.21 seized from Citibank Wealth account no. C14-069527;

(54)    $225,758.53 seized from Citibank Wealth account no. C14-067455;

(55)    $1,324,341.28 seized from Citibank Wealth account no. C14-067448;

(56)   $5,625.94 seized from Bank of America account no. 446012770461;

(57)   $246,638.94 seized from Bank of America account no. 446001941395;

(58)   $641,215.15 seized from Bank of America account no. 446028722241;

(59)   $84,529.95 seized from Bank of America account no. 446028722267;

(60)   $900.00 seized from Bank of America account no. 4468513083;

(61)   $54,251.88 seized from Bank of America account no. 446003274028;

(62)   $0.01 seized from Bank of America account no. 446024894047;

(63)   $819,916.14 seized from Bank of America account no. 446027765335;

(64)   $55,002.77 seized from Bank of America account no. 446029174775;

(65)   $75,162.00 seized from Bank of America account no. 004469528983;

(66)   $61,389.23 seized from Bank of America account no. 446027158777;

(67)   $481,427.03 seized from Bank of America account no. 446029676749;

(68)   $0.01 seized from Bank of America account no. 446024894050;

(69)   $51,020.66 seized from Bank of America account no. 446027158612;

(70)   $5,225.54 seized from Citibank account no. 9108434629;

(71)   $509,120.20 seized from Citibank account no. 9104812207;

(72)   $130,675.39 seized from Citibank account no. 9107033559;

(73)   $616,813.36 seized from Citibank account no. 9104117466;

(74)   $29,453.78 seized from Citibank account no. 9104117474;

(75)   $4,877.05 seized from Citibank account no. 9107038966;

(76)     $119,302.50 seized from Citibank account no. 9104812215;

(77)     $0.31 seized from Citibank account no. 9108420972;

(78)     $4,010.21 seized from Citibank account no. 9108439964;

(79)     $26,403.67 seized from Citibank account no. 9105743303;

(80)     $1,071.28 seized from Citibank account no. 9108014624;

(81)     $9,190.00 seized from Wells Fargo Bank representing the value of Wells Fargo Bank Cashier's Check no. 6713400721 for $9,190.00 payable to Flo-Diamond Healthcare Agency;

(82)     2013 Porsche Panamera with Vehicle Identification Number ("VIN") WP0AB2A78DL060747, seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(83)     2014 Land Rover Range Rover with VIN SALGS2EF1EA127500, seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(84)     2007 Cadillac Escalade with VIN 1GYFK638X7R386354, seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(85)     2013 Mercedes Benz GL450 with VIN 4JGDF7CE2DA108227, seized from 806 Jennings Mill Drive, Mitchellville, Maryland 20721;

(86)     2011 BMW 528i with VIN WBAFR1C56BC744097, seized from 11411 Lake Arbor Way, Bowie, Maryland 20721; and

(87)     the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland 20721, more particularly described as Lot 27, in Block B, as shown on Plat entitled, Plat Four, Woodmore at Oak Creek, per Plat Book REP 200 at Page 59, and recorded among the Land Records of Prince George's County, Maryland.

2.     Upon conviction of an offense alleged in Counts Three through Twelve, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The United States will seek a forfeiture money judgment against

the defendant in an amount equal to the value of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3.     Upon conviction of an offense alleged in Counts Fifteen through Twenty-Five, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property. The United States will seek a forfeiture money judgment against the defendant in the amount of at least $75,000,000 upon conviction of the offense alleged in Count Fifteen. The United States will seek a forfeiture money judgment against the defendant in an amount equal to the value of any property, real or personal, involved in the offense, or any property traceable to such property upon conviction of an offense alleged in Counts Sixteen through Twenty-Five.

4.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;
    b.    has been transferred or sold to, or deposited with, a third party;
    c.    has been placed beyond the jurisdiction of the Court;
    d.    has been substantially diminished in value; or
    e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 982(a)(1) & (7); and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

_____

FOREPERSON

ATTORNEY OF THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA

46